1

JOHN M. McCOY III, Cal. Bar No. 166244
E-mail: mccoyj@sec.gov

2

MOLLY M. WHITE, Cal. Bar No. 171448
E-mail: whitem@sec.gov

3

LESLIE A. HAKALA, Cal. Bar No. 199414
E-mail: hakalal@sec.gov

4

5

Attorneys for Plaintiff
Securities and Exchange Commission
Rosalind R. Tyson, Acting Regional Director

6

Andrew Petillon, Associate Regional Director
5670 Wilshire Boulevard, 11th Floor

7

Los Angeles, California 90036-3648
Telephone:  (323) 965-3998

8

Facsimile:   (323) 965-3908

9

10

11

**UNITED STATES DISTRICT COURT**

12

**DISTRICT OF NEVADA**

13

| SECURITIES AND EXCHANGE | Case No. |
|---|---|

14

| COMMISSION, | |

15

| Plaintiff, | **COMPLAINT** |

16

| vs. | |

17

| CMKM DIAMONDS, INC., URBAN | |

18

| CASAVANT, JOHN EDWARDS, | |

19

GINGER GUTIERREZ, JAMES
KINNEY, ANTHONY TOMASSO,

20

KATHLEEN TOMASSO, 1ST

21

GLOBAL STOCK TRANSFER LLC,
HELEN BAGLEY, NEVWEST

22

SECURITIES CORPORATION,

23

DARYL ANDERSON, SERGEY
RUMYANTSEV, ANTHONY

24

SANTOS, and BRIAN DVORAK,

25

| Defendants. | |

26

27

28

1  Plaintiff Securities and Exchange Commission ("Commission") alleges as
2  follows:

### JURISDICTION AND VENUE

4  1.      This Court has jurisdiction over this action pursuant to Sections 20(b),
5  20(d)(1), and 22(a) of the Securities Act of 1933 ("Securities Act"), 15 U.S.C.
6  §§ 77t(b), 77t(d)(1), & 77v(a), and Sections 21(d)(1), 21(d)(3)(A), 21(e), and 27 of
7  the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§ 78u(d)(1),
8  78u(d)(3)(A), 78u(e), & 78aa.  Defendants have, directly or indirectly, made use of
9  the means or instrumentalities of interstate commerce, of the mails, or of the
10  facilities of a national securities exchange, in connection with the transactions,
11  acts, practices, and courses of business alleged in this complaint.

12  2.      Venue is proper in this district pursuant to Section 22(a) of the
13  Securities Act, 15 U.S.C. § 77v(a), and Section 27 of the Exchange Act, 15 U.S.C.
14  § 78aa, because certain of the transactions, acts, practices, and courses of conduct
15  constituting violations of the federal securities laws occurred within this district.

### SUMMARY

17  3.      This matter involves a massive and complex scheme to improperly
18  issue and sell stock of CMKM Diamonds, Inc., purportedly a diamond and gold
19  mining company, in an unregistered distribution, and to manipulate CMKM's
20  stock price and volume through false statements from January 2003 through May
21  2005.

22  4.      With the assistance of several individuals and entities, CMKM
23  fraudulently issued hundreds of billions of shares of purportedly unrestricted stock
24  to John Edwards, the scheme's mastermind, and his associates, as well as to the
25  family and associates of Urban Casavant, the company's chief executive officer
26  and sole active director.  The combination of false information about the company
27  and substantial trading volume, facilitated by sales in an unregistered distribution,
28  induced investors to buy CMKM stock.  Edwards, Casavant, and their nominees

1   and associates sold their shares into the public markets for at least $64.2 million in
2   profit, much of which was paid to Casavant to support his extravagant lifestyle.  In
3   aggregate, Edwards made about $26.4 million, Casavant made about $31.5 million,
4   and Casavant's nominees made about $6.3 million.

5       5.     The scheme began when several private Canadian companies
6   controlled by Casavant entered into a reverse merger with a public shell owned by
7   Edwards.  Over a twenty-month period, CMKM improperly issued up to 622
8   billion shares of purportedly unrestricted stock based on both written
9   authorizations and attorney opinion letters.  These authorizations and opinions
10  were often facially inadequate, suspect, and inconsistent.  Nonetheless, CMKM's
11  transfer agent, which was owned and run by Helen Bagley, issued sheaves of
12  unlegended stock certificates.  Edwards and others then deposited the certificates
13  with various broker-dealers, including NevWest Securities Corporation, and sold
14  the shares into the market.  Promptly after selling CMKM stock, Edwards and the
15  others wired the proceeds to a series of bank accounts, provided large sums to
16  Casavant, and used the money for various purposes including paying gambling
17  debts, investing in real estate, and generating more shareholder interest.

18      6.     Casavant generated investor interest in CMKM by using false press
19  releases, Internet chat boards, and "funny car" race events across the country.  To
20  divert attention from their own dumping of CMKM shares, Casavant persuaded
21  CMKM's investors that the reported high trading volume in CMKM stock
22  reflected extensive "naked short selling" rather than ordinary stock dilution.  This
23  promotion was extremely successful, and about 40,000 investors purchased
24  CMKM stock during the period of the fraud.  In reality, Casavant ran the company
25  from his house in Las Vegas, and CMKM had no meaningful operations other than
26  issuing and promoting its own stock.

27      7.     During the period, CMKM's stock price varied from $0.0001 to
28  $0.001, with volume sometimes exceeding two billion shares per day.

8.     On March 3, 2005, the Commission ordered a 10-day trading suspension pursuant to Section 12(k) of the Exchange Act.  Shortly thereafter, the Commission instituted an administrative proceeding to revoke the registration of CMKM's stock pursuant to Section 12(j) of the Exchange Act based on the company's failure to file periodic reports.

9.     Even after the Commission took these steps, the individuals behind the CMKM fraud continued to sell stock.  They only stopped selling CMKM's stock the day after an evidentiary hearing was held in the administrative proceeding, at which point substantial negative information about CMKM became public.

10.    In October 2005, the Commission revoked the registration of CMKM's stock, effectively ending public trading in the stock.

11.    The defendants, by engaging in the conduct described in this complaint, have all violated the registration provisions of the federal securities laws.  In addition, CMKM and Casavant violated the antifraud and various reporting, record keeping, and internal controls provisions.

12.    By this complaint, the Commission seeks a permanent injunction against all defendants.  The Commission also seeks an accounting, disgorgement with prejudgment interest, and civil penalties against Casavant, Edwards, Ginger Gutierrez and James Kinney (Casavant's nominees), Anthony Tomasso and Kathleen Tomasso (Edwards' nominees), 1st Global Stock Transfer LLC and Bagley (CMKM's transfer agent), NevWest, Daryl Anderson, Sergey Rumyantsev and Anthony Santos (Edwards' stockbroker), and Brian Dvorak (CMKM's lawyer).  In addition, the Commission seeks a penny stock bar against Casavant, Edwards, Gutierrez, Kinney, Anthony Tomasso, Kathleen Tomasso, Bagley, Anderson, Rumyantsev, Santos, and Dvorak.  Finally, the Commission seeks an order prohibiting Casavant from acting as an officer or director of any public company.

1

## THE DEFENDANTS

2

### A.    The Issuer

3    13.    CMKM Diamonds, Inc. was at all relevant times a Nevada
4  corporation based in Las Vegas that purported to acquire and develop mining
5  properties in North and South America.  CMKM's common stock was registered
6  with the Commission pursuant to Section 12(g) of the Exchange Act and was
7  quoted on the Pink Sheets until the Commission ordered deregistration on
8  October 28, 2005.  In March 2007, one shareholder became CMKM's sole officer
9  and director.  The company, which is now headquartered in Tyler, Texas, currently
10  has no operations and essentially no assets.

11

### B.    The Scheme Masterminds

12    14.    Urban Casavant, age 51, is a Canadian citizen who resided in Las
13  Vegas during the relevant period.  At all relevant times, Casavant served as the
14  CEO and chairman of the board of CMKM.  He resigned all of his positions at
15  CMKM in March 2007.  Casavant currently lives in Canada.  In October 2004, the
16  Saskatchewan Financial Services Commission issued a cease-and-desist order to
17  Casavant in connection with CMKM.

18    15.    John Edwards, age 65, is a British citizen who resided in Las Vegas
19  during the relevant period.  Edwards conducts his business activities through
20  several dozen corporate entities and trusts over which he has exclusive control (the
21  "Edwards Entities"), as well as through certain nominees.  Using approximately 34
22  different brokerage accounts at NevWest, Edwards sold almost 260 billion shares
23  of CMKM stock from March 2003 through May 2005, generating proceeds in
24  excess of $53.3 million.

25

### C.    The Nominees

26    16.    Ginger Gutierrez, age 37, at all relevant times lived in Las Vegas.
27  Gutierrez sold substantial quantities of CMKM stock and transferred a large
28  percentage of the proceeds to Casavant-controlled accounts.  Gutierrez also acted

1  as Casavant's personal assistant and secretary, particularly in connection with

2  CMKM and its stock promotion activities.

3      17.    James Kinney, age 37, at all relevant times lived in Las Vegas.

4  Kinney sold substantial quantities of CMKM stock and transferred a large

5  percentage of the proceeds to Casavant-controlled accounts on his own and

6  through Part-Time Management, Inc., a shell corporation he jointly controlled with

7  Gutierrez.

8      18.    Kathleen Tomasso, age 56, is a resident of Boca Raton, Florida.  She

9  acted as a nominee for Edwards, and sold CMKM stock on his behalf.  She is

10  married to Anthony Tomasso.

11      19.    Anthony Tomasso, age 68, is a resident of Boca Raton, Florida.  He

12  acted as a nominee for Edwards, and sold CMKM stock on his behalf.  He is

13  married to Kathleen Tomasso.

14      **D.**    **The Transfer Agent**

15      20.    1st Global Stock Transfer LLC, a Nevada corporation with its

16  principal place of business in Las Vegas, has been registered as a transfer agent

17  with the Commission since October 2001.  1st Global has served as CMKM's

18  transfer agent since 2002.  It is owned and operated by Helen Bagley.

19      21.    Helen Bagley, age 61, resides in Las Vegas.  Bagley owns and

20  operates 1st Global.

21      **E.**    **The Stockbrokers**

22      22.    NevWest Securities Corporation, a Nevada corporation located in Las

23  Vegas, was the broker-dealer that Edwards used to sell his shares of CMKM.

24  NevWest registered with the Commission in October 1999.  As of July 16, 2007,

25  NevWest deregistered with the Commission, and currently has no operations.

26      23.    Daryl Anderson, age 39, resided in Las Vegas at all relevant times,

27  and now lives in Laguna Beach, California.  Anderson served as Edwards'

28

1  registered representative at NevWest. Anderson stopped working as a broker in
2  March 2007.

3      24.    Sergey Rumyantsev, age 37, is a Russian citizen living in Las Vegas.
4  He served as NevWest's CEO and head trader. He holds Series 4, 7, 24, 27, 53,
5  and 55 licenses.

6      25.    Anthony Santos, age 42, a resident of Las Vegas, is an attorney
7  licensed in Connecticut who served as NevWest's executive vice president, chief
8  compliance officer, and general counsel. He holds Series 7 and 24 licenses.

9      **F.    The Attorney**

10     26.    Brian Dvorak, age 52, resided in Las Vegas at all relevant times. As
11 CMKM's attorney, Dvorak prepared hundreds of bogus opinion letters supporting
12 the issuance of purportedly unrestricted CMKM stock. During the relevant period,
13 Dvorak also operated the website www.144opinionletters.com. Dvorak now
14 resides in Boulder, Colorado. In October 2007, Dvorak filed for bankruptcy under
15 Chapter 7 of the Bankruptcy Code. Dvorak is licensed to practice law in Nevada.

16                      **THE SCHEME**

17     **A.    Background**

18     27.    From 1998 to 2001, CMKM was a Delaware corporation
19 headquartered in Ontario, Canada. In late 2001 or early 2002, Edwards acquired
20 the then-empty corporate shell, reincorporated it, and listed "Ian McIntyre" as its
21 president and director in Nevada and Commission filings. The Commission
22 believes, and on that basis alleges, that "Ian McIntyre" is an alias used by Edwards.

23     28.    In 2001, Casavant controlled five private Canadian companies that
24 held largely untested mineral claims in Saskatchewan, Canada. On or about
25 November 25, 2002, Edwards and Casavant agreed to a reverse merger in which
26 CMKM acquired the mineral claims, purportedly in exchange for $2,000,000 and
27 2.8 billion shares of common stock. Casavant became the sole director of CMKM,
28 as well as its president and CEO. CMKM announced, however, that "McIntyre"

1   would continue to act as director on "post-merger matters" until January 15, 2003.
2   Immediately after the merger, the company increased its number of authorized
3   shares from 500 million to 10.5 billion, and as of about December 4, 2002, CMKM
4   retained 1st Global as its transfer agent.

5         29.    CMKM did not maintain any meaningful books and records.  The
6   company never completed a general ledger.  Nor did CMKM keep accurate
7   documentation of its debts, assets, liabilities, or stock sales.  CMKM failed to
8   maintain any system of accounting controls.  Casavant was CMKM's only
9   functional officer and director.  Casavant failed to implement any system of
10   accounting controls, which resulted in CMKM's failure to record assets, liabilities,
11   expenditures, or related-party transactions.

12         **B.**    **Stock Issuances**

13             **1.**    **Edwards' Relationship with Helen Bagley and 1st Global**

14         30.    Bagley met Edwards in the mid-1990s.  1st Global, which Bagley
15   owns and operates, served as the transfer agent for multiple companies, including
16   CMKM, in which Edwards has actively traded stock.  Bagley received about
17   $200,000 from Edwards in a purported loan.  Bagley regularly followed Edwards'
18   directives, discussed CMKM stock with him, and issued unrestricted CMKM stock
19   certificates at his instruction.

20         31.    In addition to suspicious payments from Edwards, Bagley directly and
21   indirectly through her son received payments in excess of $344,000 from Kathleen
22   and Anthony Tomasso ("the Tomassos") during 2003 and 2004.  The Tomassos,
23   who sold billions of shares of CMKM stock, were nominees for Edwards, through
24   an intermediary.

25         32.    CMKM stock issuances and transfers represented more than 50% of
26   1st Global's business in the relevant period.

27

28

## 2.    CMKM's Stock Issuances

33.    From December 2002 through September 2004, on approximately 60 separate occasions, 1st Global issued a total of more than 589.7 billion shares of CMKM stock in certificate form without a restrictive legend to the Edwards Entities, Edwards' nominees, Casavant's nominees, and others.

34.    A restrictive legend is a statement placed upon a stock certificate stating, among other things, that the stock is not registered with the Commission pursuant to Section 5 of the Securities Act and that an ownership interest in the stock represented by that certificate cannot be sold or transferred absent registration or the existence of a valid exemption from registration.  The presence of a restrictive legend on a stock certificate forecloses future sale or distribution of that stock certificate until the issuer's transfer agent removes the legend by reissuing the certificate without the legend being present.  The absence of the restrictive legend on the stock certificate creates the impression that the stock it represents is the subject of a registration statement with the Commission or exempt from such registration.

35.    To accommodate these issuances, from November 2002 through August 2004, CMKM increased its number of authorized shares five times, from 10.5 billion to 800 billion shares.  The purportedly unrestricted CMKM stock issuances were based on obviously incomplete and suspicious and, in some cases, forged documentation.  Although Bagley insisted on having certain supporting documentation, usually a board authorization and an attorney opinion letter, in order to issue unlegended stock certificates, Bagley either knew, or recklessly ignored red flags suggesting, that these documents were facially incomplete and suspicious.

36.    For instance, Bagley repeatedly issued substantial quantities of stock certificates without restrictive legends in late 2002 and 2003 purportedly based on forged attorney opinion letters.  The forged letters list an office address that the

attorney did not occupy until months after the letters were purportedly written and the shares issued. Accordingly, it was temporally impossible for Bagley to have issued the shares when she says she did, based on the letters she claims to have relied on. Bagley either issued unlegended shares on the dates she claimed without opinion letters and later papered her files with forged letters, or Bagley actually issued the shares later in 2003 and back-dated her records.

37. Bagley accepted attorney opinion letters that did not identify the names of the recipients of the purportedly unrestricted stock, specify how many shares each was to receive, or correctly list the company's name.

38. Other opinion letters related to the sale of previously issued CMKM shares under Rule 144 promulgated under the Securities Act, but Bagley used the letters to support new issuances of purportedly unrestricted stock. One opinion letter, identical except for the date, was used for three separate new issuances, in July, August, and September 2003. In two of these issuances, the names in the legal opinion do not match completely the names under which the shares were issued.

39. Some examples of fraudulent stock issuances are:

    a. In January 2003, CMKM issued more than 2.7 billion shares of purportedly unrestricted stock to 29 separate entities controlled by Edwards, pursuant to board minutes signed by Casavant. The minutes offer no explanation for the issuances, which were issued without a restrictive stock legend pursuant to a temporally impossible, facially incomplete, and forged attorney opinion letter.

    b. In February 2003, CMKM issued 68 million purportedly unrestricted shares to an associate of Edwards "for the extension of the existing forbearance agreement contract" pursuant to board minutes signed by "Ian McIntyre, Trustee." By this time, however, "Ian McIntyre" supposedly had relinquished all his roles at CMKM. At no time was

"Ian McIntyre" listed as a control person for CMKM, and thus authorized to sign issuance instructions, in the documentation from the company in Bagley's files.

c. Also in February 2003, the company issued 202 million purportedly unrestricted shares "relating to the 1999 financing" pursuant to board minutes signed by "Ian McIntyre, Trustee." These shares were issued to six individuals or entities linked to Edwards, at least two of whom had no involvement with CMKM or its predecessors in 1999. Based on another temporally impossible, incomplete, and forged attorney opinion letter, Bagley issued the stock certificates without a restrictive legend.

d. In August 2003, CMKM issued 4 billion purportedly unrestricted shares to 25 entities controlled by Edwards (2 billion shares) and to three Casavant nominees (2 billion shares). These shares were issued without explanation pursuant to board minutes signed by Casavant and supported by a forged opinion letter purportedly written by an attorney who was ineligible to practice law at that time. Moreover, the names listed in the letter did not completely match the names to whom Bagley issued certificates.

e. In March 2004, based on Edwards' handwritten instructions to Dvorak, CMKM issued 75 billion shares of purportedly unrestricted stock to sixteen of the Edwards Entities and Gutierrez.

f. In August and September 2004, CMKM issued more than 233.7 billion purportedly unrestricted shares to approximately 258 individuals or entities who allegedly invested in the company in 2001 but did not then receive certificates, including the Edwards Entities, Gutierrez, Kinney, and others. The board resolutions, which were signed by Casavant, and the opinion letters, which were prepared and

signed by both Dvorak and another lawyer, acknowledge in most instances that the company had remembered to issue the underlying shares themselves earlier in 2004, but now also recalled that the investors were entitled to a dividend reflecting a 2-for-1 stock split that took place in 2003.

40.     Although Casavant orchestrated some of these and other fraudulent stock issuances, Edwards initiated others without Casavant's knowledge or consent. Some of the documents supporting the issuances bear the signature "Ian McIntyre." Bagley had never met "Ian McIntyre," and she accepted board authorizations with his signature even though her own files indicated that he played no formal role at CMKM. In addition, the "Ian McIntyre" issuances were supported by forged attorney opinion letters.

### 3.     Dvorak Prepares Baseless and False Attorney Opinion Letters

41.     Beginning in December 2003, Casavant retained Dvorak as corporate counsel for CMKM, primarily to prepare board resolutions and attorney opinion letters authorizing the issuance of purportedly unrestricted stock. Over a ten-month period, Dvorak wrote at least 464 opinion letters, the vast majority of which contained baseless or fabricated justifications for the issuance of unrestricted CMKM stock. Armed with these letters, in 2004, CMKM issued more than 606 billion unrestricted shares to the Edwards Entities, Casavant's nominees, and others.

42.     The majority of Dvorak's letters opined essentially that shares may be issued or deemed unrestricted because the shares actually should have been issued more than two years earlier. Dvorak had no reliable evidence upon which to base this opinion. Dvorak knew that he needed back-up documentation to verify the facts upon which his opinion letters were based. Dvorak nevertheless prepared almost all of his letters based solely on oral representations from CMKM insiders;

abbreviated board resolutions (some of which Dvorak also drafted); and summary spreadsheets listing the name of the recipient, the number of shares, and information about past issuances. Dvorak also prepared opinion letters based on Edwards' handwritten instructions, although he knew from past experience that Edwards sold corporate shells for stock, falsified documents, and dumped stock into the market. At the time that Dvorak issued the opinion letters, Dvorak suspected that Edwards was giving Casavant money. Dvorak also knew that Edwards had no formal role at CMKM, that Casavant accused Edwards of directing Bagley to issue unauthorized shares, and that Edwards exerted undue pressure on Casavant.

43.    Dvorak knew that there was no back-up documentation for most of his letters. The oral representations that Dvorak relied on were equally unreliable and factually impossible. For example, Dvorak wrote letters stating that entities had purchased CMKM shares before those entities were even formed.

44.    Dvorak was paid $350 per letter. Dvorak received at least $495,000 from Casavant and his nominees during 2004.

## C.    Public Disclosures and Stock Promotion Activities

45.    In July 2003, at Edwards' suggestion, Casavant filed with the Commission a Form 15 removing CMKM from the reporting requirements of Section 12(g) of the Exchange Act because CMKM allegedly had fewer than 300 shareholders of record. This filing was false because the company then had more than 600 shareholders of record. From July 2003 to February 2005, CMKM made no filings with the Commission, did not publicly disclose how many of its shares were outstanding, and instructed 1st Global not to release this information. As functionally the only officer and director of CMKM, Casavant was responsible for ensuring that CMKM complied with its reporting obligations.

46.    Instead, throughout this period, the company issued numerous false and misleading press releases. For example, in December 2002, CMKM issued a

1   press release claiming that the company "was sponsoring a representative office in
2   Antwerp, Belgium" to promote "the Casavant diamond brand" but did not disclose
3   that the company had not yet found a single diamond. In early January 2003,
4   CMKM asked shareholders to hold their shares in certificate form "indefinitely" to
5   help the company "combat naked short selling." In February 2003, CMKM
6   announced that its "ancient Chinese jade collection," previously valued by the
7   company at more than $50 million, had been appraised by a noted expert in such
8   objects. This expert, however, never had any involvement with CMKM and never
9   appraised any such collection. CMKM's press releases in early 2004 described the
10  company's efforts to implement "core drilling" on its mineral claims. These bulletins
11  culminated with a March 2004 release announcing a "kimberlite ore discovery."
12  Kimberlite is the ore in which diamonds are usually found. "The new kimberlite
13  discovery" was named "the Carolyn Pipe" after Casavant's wife. However, two and
14  a half months later, the public learned that this kimberlite ore had first been
15  discovered in 1996.

16      47.    CMKM and Casavant also propped up interest in the company's
17  stock—while selling into the market—through a variety of Internet activities
18  designed to foster shareholder interest and excitement. The company had its own
19  website, as well as websites for its racing team and to sell promotional items
20  emblazoned with catch phrases such as: "SOON! CMKX.net", "I'm a CMKX.net
21  Boardaholic", "To DA Moon! CMKX.net." In addition, at least eight active
22  Internet message boards focused on CMKM and its activities. Casavant was
23  "interviewed" for a widely distributed webcast in mid-October 2004. In that
24  interview, Casavant misrepresented that CMKM was "ahead of schedule" in
25  preparing periodic reports, even though it had not even begun compiling a general
26  ledger, and that CMKM was "ahead of schedule" and "drilling 24/7" up in Canada.

27      48.    Perhaps Casavant's most effective tool to promote CMKM was
28  "CMKXtreme," a team of motorbike, truck, and "funny car" racers. Coordinated

1    by Gutierrez and Kinney, the CMKXtreme-sponsored race team traveled across the

2    country to a series of monthly races. Casavant's goal for CMKXtreme was to

3    promote CMKM's stock. The racecars that CMKXtreme sponsored advertised

4    "CMKX," CMKM's stock symbol. Likewise, "Got CMKX?" was posted on

5    trucks, banners, billboards, and crew-member shirts. Hundreds of CMKM

6    shareholders attended the races and visited the CMKM-sponsored tent, where they

7    could study a map of CMKM's alleged mineral claims, watch a video loop of

8    CMKM's purported drilling work, and meet and greet Casavant and his family.

9       49.     The press releases, Internet hype, and racing promotions were

10    successful in attracting and maintaining a loyal shareholder base for CMKM for

11    almost two years. The sustained demand for CMKM stock fueled by the constant

12    promotional efforts allowed the defendants to continue selling newly issued stock

13    to the public. About 40,000 people purchased CMKM stock in market transactions

14    during the fraud, particularly after June 2004 when CMKXtreme became

15    extremely popular.

16       **D.**      **Edwards Sells CMKM Stock**

17             **1.**      **Edwards Deposits and Liquidates CMKM Stock Through**

18                   **NevWest Securities Corporation**

19       50.     Beginning in September 2002, Edwards opened at least 36 brokerage

20    accounts at NevWest, a full service retail broker-dealer in Las Vegas. The vast

21    majority of these accounts consisted of trusts and corporations that had ties to

22    Edwards and over which Edwards exercised complete control. Edwards used his

23    personal social security number for about 30 of the accounts. The address

24    Edwards used for almost all of his accounts matched the address used by CMKM

25    on its Commission filings from December 2001 through September 2002.

26       51.     All of Edwards' accounts and trades were handled by one of

27    NevWest's registered representatives, Daryl Anderson. Beginning in February

28    2003, Edwards visited NevWest's offices approximately weekly to hand-deliver

CMKM stock certificates to Anderson.  These certificates were often sequentially numbered and recently issued.  In total, Edwards deposited 597 CMKM stock certificates at NevWest, totaling more than 261 billion shares.  Edwards acquired at least 14.2 billion shares directly from CMKM, and acquired at least 51.9 billion shares from entities that received their shares directly from CMKM.  Edwards also acquired shares from Casavant's nominees and family members.

52.    Upon receiving the stock certificates, NevWest contacted 1st Global to verify that the certificates were "validly issued" and unrestricted.  Bagley or her son vouched for all of Edwards' stock certificates, and NevWest deposited all of them into his accounts.  Edwards then gave Anderson price limit orders to sell the stock.  Occasionally Anderson used his discretion to decide which of Edwards' accounts to empty of CMKM stock.  Edwards sold his CMKM shares within two weeks to three months after depositing them.

53.    From March 2003 through May 11, 2005, Edwards sold 259,890,832,854 shares of CMKM stock in 569 separate transactions at NevWest, generating proceeds of more than $53.3 million.  By August 2004, Edwards' shares made up more than 20% of the total number of authorized shares of CMKM.  By May 2005, Edwards had sold more than 32% of CMKM's total authorized shares through NevWest.

54.    NevWest primarily sold the CMKM stock to one other broker-dealer until mid-October 2004, when that broker-dealer informed NevWest that it would no longer trade CMKM shares because the Saskatchewan Financial Services Commission, a Canadian regulator, had issued a cease-and-desist order regarding CMKM stock.  NevWest then found a new buyer and continued selling CMKM stock.  Online investors were the primary purchasers of Edwards' shares.

55.    NevWest charged Edwards a 5% commission rate, in contrast to the 3-4% rate it usually charged, and Edwards' trades generated more than $2,575,000 in commissions for the firm.  Over the entire period of the fraud, Edwards'

1  commissions on the CMKM trades amounted to 35.7% of NevWest's total

2  revenue. In one quarter, Edwards' CMKM trades amounted to 66.2% of

3  NevWest's total revenues. Pursuant to his contractual arrangement with NevWest,

4  Anderson received approximately 90% of the commissions he generated, and thus

5  earned approximately $2,300,000 for handling Edwards' trades in CMKM stock.

6      56.    Until late 2004, Edwards wired the proceeds of his CMKM sales "as

7  they became available" primarily to two bank accounts whose names did not match

8  the names on NevWest's brokerage accounts. One of the entities that controlled

9  several of these accounts listed "Ian McIntyre" as its registered agent. NevWest

10  was aware that "Ian McIntyre" had ties to both this entity and to CMKM, but never

11  sufficiently inquired about the connection. After another regulator raised concerns

12  about the third-party wires in late 2004, Anthony Santos, Anderson's supervisor,

13  advised Edwards to open corresponding bank accounts for each Edwards Entity in

14  order to avoid "confusion."

15     57.    In 2004, Santos and Sergey Rumyantsev, NevWest's president and

16  head trader, began to have concerns about Edwards' trading activities. Anderson,

17  Santos, and Rumyantsev all considered CMKM to be a questionable issuer about

18  which reliable information was not publicly available. Anderson, Santos, and

19  Rumyantsev all knew that Edwards had previously been involved with CMKM,

20  and had all reviewed CMKM's past Commission filings, which listed the same

21  address that Edwards used to open most of his NevWest accounts. Edwards

22  provided NevWest with vague oral explanations for his activities, declined to

23  identify his "clients," and told NevWest that he was not an affiliate of CMKM and

24  that no proceeds from his sales were returned to the company or its affiliates.

25  Anderson, Santos, and Rumyantsev never (1) asked Edwards to describe his

26  current involvement with CMKM beyond whether he was an affiliate; (2)

27  attempted to contact the company itself to ask about Edwards; (3) asked Edwards

28  for more information about his sources of CMKM stock, such as the names of the

sellers, or the price Edwards paid for the shares; (4) inquired why Edwards' shares were unrestricted; (5) obtained any information about Edwards' unidentified "clients," such as their names or how Edwards came to represent them; or (6) had any contact with anyone other than Edwards in connection with Edwards' accounts. Edwards provided NevWest with a short letter from his counsel opining without explanation that Edwards' trading practices were legal. Even months after inquiries from another regulator, after the Commission requested NevWest's records related to Edwards, and after the Commission suspended trading in CMKM's stock and initiated deregistration proceedings, NevWest allowed Edwards to sell as much CMKM stock as he wished.

### 2. Edwards Profits From the Sales of CMKM Stock by Others

58.     Using the tactics described above, Edwards also arranged the issuance of purportedly unrestricted CMKM stock to nominees who, through intermediaries, returned a portion of the sales proceeds to Edwards. Specifically, Edwards and Bagley apparently coordinated the issuances of about 77.3 billion shares of unrestricted CMKM stock to five entities near Boca Raton, Florida. The five entities were owned by the Tomassos. The Tomassos sold some of the CMKM stock promptly upon receipt, generating proceeds of at least $6.5 million. The Tomassos then wired more than $2.2 million to Edwards, $344,000 to Bagley and her son, and substantial sums to other Edwards associates. The Tomassos kept approximately $648,500 for themselves. Bagley knew about this scheme.

### 3. Edwards Spends and Distributes the Proceeds of His Stock Sales

59.     Edwards accumulated more than $53.1 million from his CMKM-related trading. While Edwards invested some of those proceeds in real estate throughout the country, much of his profits went back to Casavant and Casavant's alter-ego, CMKM. Casavant directly and indirectly received more than $26.7 million from Edwards. Of that, $10 million was based on a sham transaction

1   between CMKM and St. George Metals, Inc., another public shell controlled by
2   Edwards.

3       60.    Edwards noted on many of his checks to Casavant that the payments
4   were for "stock purchase CMKX."

5       **E.    Casavant's Nominees Sell CMKM Stock**

6       61.    Casavant also profited by issuing CMKM stock to, among others,
7   Gutierrez and Kinney. Gutierrez and Kinney sold the shares and returned the
8   proceeds to Casavant, his family members, or entities he controlled.

9       62.    During the relevant period, Casavant relied heavily on Gutierrez.
10  Gutierrez served as Casavant's secretary and personal assistant, and was involved
11  in CMKM's affairs from the outset. Gutierrez (1) acted as CMKM's investor
12  relations contact in 2003 (along with Kinney); (2) regularly delivered documents
13  such as stock certificates, opinion letters, and shareholder lists to and from Bagley;
14  (3) delivered documents to Edwards' office or met him at 1st Global's offices;
15  (4) periodically drafted CMKM's press releases for Casavant's review;
16  (5) maintained the limited records that CMKM kept; (6) compiled the list of
17  shareholders to receive additional unrestricted stock as "dividends" in September
18  2004; (7) had signatory authority on many of Casavant's and CMKM's bank
19  accounts, wrote checks, and wired money on Casavant's behalf; and (8) oversaw
20  CMKM's promotional activities at the stock car races.

21      63.    From 2003 through 2005, Gutierrez sold almost 18 billion shares of
22  unrestricted CMKM stock in her own name. Dvorak prepared opinion letters
23  allowing much of that stock to be purportedly unrestricted based on the premise
24  that Gutierrez had provided services for the shares in 2001, but Gutierrez did not
25  meet Casavant until 2002. Gutierrez generated about $3.1 million from her sale of
26  CMKM shares. Although Gutierrez kept some of the money as compensation for
27  the services she provided to Casavant and CMKM, she gave Casavant
28  approximately $1.1 million.

1    64.    Kinney acted as Casavant's intermediary, running errands and
2 arranging promotional opportunities. Kinney (along with Gutierrez) served as
3 CMKM's investor relations contact in 2003. From 2003 through 2005, Kinney
4 sold about 61.4 billion shares of purportedly unrestricted CMKM stock. Like
5 Gutierrez, Kinney received many of these shares based on opinion letters from
6 Dvorak saying that Kinney had provided services in 2001. Kinney actually met
7 Casavant through Gutierrez in 2002. Kinney made more than $6.7 million from
8 the sale of these CMKM shares and transferred about $3.4 million of those funds
9 back to Casavant.

10    65.    Gutierrez and Kinney also sold CMKM stock through a private
11 corporate shell, Part-Time Management, Inc., which Casavant had given them. In
12 2004, Part-Time Management sold approximately 9 billion shares of unrestricted
13 stock based largely on another apparently inaccurate Dvorak opinion letter. Part-
14 Time Management made more than $1.9 million from selling these shares, of
15 which about $1.2 million was returned to Casavant.

16    **F.    <u>Subsequent Events</u>**

17    66.    At all relevant times, CMKM maintained virtually no corporate books
18 or records, such as a general ledger, bank account records, or documents accurately
19 reflecting related party transactions. Likewise, CMKM implemented and
20 maintained no discernable internal controls.

21    67.    After receiving inquiries from the Commission, CMKM
22 acknowledged in February 2005 that its Form 15 was false, and that the company
23 was therefore delinquent in filing periodic reports as required by Section 13(a) of
24 the Exchange Act, and Rules 13a-1 and 13a-13 thereunder. In March 2005, the
25 Commission instituted proceedings to deregister the company's stock pursuant to
26 Section 12(j) of the Exchange Act. The company opposed the Commission's
27 action. In an evidentiary hearing in May 2005, the truth about much of CMKM's
28 activities became public. The administrative law judge concluded that

1 deregistration was appropriate.  The Commission issued its final order

2 deregistering the company's stock in October 2005.

3     68.    In March 2007, Casavant resigned all of his roles at CMKM and

4 appointed a shareholder to take his place.  The company currently has no

5 operations or assets of significant value.

**FIRST CLAIM FOR RELIEF**

**FRAUD IN CONNECTION WITH THE**

**PURCHASE OR SALE OF SECURITIES**

**Violations of Section 10(b) of the Exchange Act**

**and Rule 10b-5 thereunder**

**(Against CMKM and Casavant)**

12     69.    The Commission realleges and incorporates by reference ¶¶ 1 through

13 68 above.

14     70.    CMKM and Casavant, and each of them, by engaging in the conduct

15 described above, directly or indirectly, in connection with the purchase or sale of a

16 security, by the use of means or instrumentalities of interstate commerce, of the

17 mails, or of the facilities of a national securities exchange, with scienter:

18     a.    employed devices, schemes, or artifices to defraud;

19     b.    made untrue statements of a material fact or omitted to state a material

20         fact necessary in order to make the statements made, in the light of the

21         circumstances under which they were made, not misleading; or

22     c.    engaged in acts, practices, or courses of business which operated or

23         would operate as a fraud or deceit upon other persons.

24     71.    By engaging in the conduct described above, CMKM and Casavant

25 violated, and unless restrained and enjoined will continue to violate, Section 10(b)

26 of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder, 17 C.F.R.

27 § 240.10b-5.

28

## SECOND CLAIM FOR RELIEF

### UNREGISTERED OFFER AND SALE OF SECURITIES

### Violations of Sections 5(a) and 5(c) of the Securities Act

### (Against All Defendants)

72.     The Commission realleges and incorporates by reference ¶¶ 1 through 68 above.

73.     All of the defendants, and each of them, by engaging in the conduct described above, directly or indirectly, made use of means or instruments of transportation or communication in interstate commerce or of the mails, to offer to sell or to sell securities, or to carry or cause such securities to be carried through the mails or in interstate commerce for the purpose of sale or for delivery after sale.

74.     No registration statement has been filed with the Commission or has been in effect with respect to any of the offerings alleged herein.

75.     By engaging in the conduct described above, all of the defendants violated, and unless restrained and enjoined will continue to violate, Sections 5(a) and 5(c) of the Securities Act, 15 U.S.C. §§ 77e(a) and 77e(c).

### THIRD CLAIM FOR RELIEF

### VIOLATIONS OF COMMISSION PERIODIC

### REPORTING REQUIREMENTS

### Violations of Section 13(a) of the Exchange Act

### and Rules 13a-1 and 13a-13 thereunder

### (Against Casavant)

76.     The Commission realleges and incorporates by reference ¶¶ 1 through 68 above.

77.     CMKM violated Section 13(a) of the Exchange Act and Rules 13a-1 and 13a-13 thereunder, by failing to file annual reports on Form 10-KSB for the fiscal years ended December 31, 2002, December 31, 2003, and December 31,

1  2004 and by failing to file quarterly reports on Form 10-QSB for the quarters

2  ending March 31, 2003, June 30, 2003, September 30, 2003, March 31, 2004,

3  June 30, 2004, September 30, 2004, March 31, 2005, and June 30, 2005.

4        78.    Casavant knowingly provided substantial assistance to CMKM's

5  violation of Section 13(a) of the Exchange Act and Rules 13a-1 and 13a-13

6  thereunder.

7        79.    By engaging in the conduct described above and pursuant to Section

8  20(e) of the Exchange Act, 15 U.S.C. § 78t(e), Casavant aided and abetted

9  CMKM's violations, and unless restrained and enjoined will continue to aid and

10  abet violations, of Section 13(a) of the Exchange Act, 15 U.S.C. § 78m(a), and

11  Rules 13a-1 and 13a-13 thereunder, 17 C.F.R. §§ 240.13a-1 and 240.13a-13.

## FOURTH CLAIM FOR RELIEF

### RECORD KEEPING VIOLATIONS

**Violations of Section 13(b)(2)(A) of the Exchange Act**

**and Violations of Rules 13b2-1 thereunder**

**(Against CMKM and Casavant)**

17        80.    The Commission realleges and incorporates by reference ¶¶ 1 through

18  68 above.

19        81.    CMKM violated Section 13(b)(2)(A) of the Exchange Act by failing

20  to make or keep books, records and accounts which, in reasonable detail,

21  accurately and fairly reflected its transactions and the disposition of its assets.

22        82.    Casavant knowingly provided substantial assistance to CMKM's

23  violation of Section 13(b)(2)(A) of the Exchange Act.

24        83.    By engaging in the conduct described above and pursuant to

25  Section 20(e) of the Exchange Act, 15 U.S.C. § 78t(e), Casavant aided and abetted

26  CMKM's violations, and unless restrained and enjoined will continue to aid and

27  abet violations, of Section 13(b)(2)(A) of the Exchange Act, 15 U.S.C.

28  § 78m(b)(2)(A).

84.     By engaging in the conduct described above, Casavant violated Exchange Act Rule 13b2-1 by, directly or indirectly, falsifying or causing to be falsified CMKM's books, records, and accounts subject to Section 13(b)(2)(A) of the Exchange Act.  Unless restrained and enjoined, Casavant will continue to violate Rule 13b2-1, 17 C.F.R. § 240.13b2-1.

**FIFTH CLAIM FOR RELIEF**

**INTERNAL CONTROLS VIOLATIONS**

**Violations of Section 13(b)(2)(B) of the Exchange Act**

**(Against CMKM and Casavant)**

85.     The Commission realleges and incorporates by reference ¶¶ 1 through 68 above.

86.     CMKM violated Section 13(b)(2)(B) of the Exchange Act by failing to devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that (i) transactions are executed in accordance with management's general or specific authorization; (ii) transactions are recorded as necessary (I) to permit preparation of financial statements in conformity with generally accepted accounting principles or any other criteria applicable to such statements, and (II) to maintain accountability for assets; (iii) access to assets is permitted only in accordance with management's general or specific authorization; and (iv) the recorded accountability for assets is compared with the existing assets at reasonable intervals and appropriate action is taken with respect to any differences.

87.     Casavant knowingly provided substantial assistance to CMKM's violation of Section 13(b)(2)(B) of the Exchange Act.

88.     By engaging in the conduct described above and pursuant to Section 20(e) of the Exchange Act, 15 U.S.C. § 78t(e), Casavant aided and abetted CMKM's violations, and unless restrained and enjoined will continue to aid and

1 | abet violations, of Section 13(b)(2)(B) of the Exchange Act, 15 U.S.C.

2 | § 78m(b)(2)(B).

## **PRAYER FOR RELIEF**

WHEREFORE, the Commission respectfully requests that the Court:

### I.

Issue findings of fact and conclusions of law that the defendants committed the alleged violations.

### II.

Issue judgments, in a form consistent with Rule 65(d) of the Federal Rules of Civil Procedure, permanently enjoining CMKM, Casavant, Edwards, Gutierrez, Kinney, Anthony Tomasso, Kathleen Tomasso, 1st Global, Bagley, NevWest, Anderson, Rumyantsev, Santos, and Dvorak, and their officers, agents, servants, employees and attorneys, and those persons in active concert or participation with any of them, who receive actual notice of the order by personal service or otherwise, and each of them, from violating Sections 5(a) and 5(c) of the Securities Act, 15 U.S.C. §§ 77e(a) and 77e(c).

### III.

Issue judgments, in a form consistent with Rule 65(d) of the Federal Rules of Civil Procedure, permanently enjoining CMKM and Casavant, and their officers, agents, servants, employees and attorneys, and those persons in active concert or participation with any of them, who receive actual notice of the order by personal service or otherwise, and each of them, from violating Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5.

### IV.

Issue a judgment, in a form consistent with Rule 65(d) of the Federal Rules of Civil Procedure, permanently enjoining CMKM and its officers, agents, servants, employees and attorneys, and those persons in active concert or

1   participation with any of them, who receive actual notice of the order by personal

2   service or otherwise, and each of them, from violating Sections 13(b)(2)(A) and

3   13(b)(2)(B) of the Exchange Act, 15 U.S.C. §§ 78m(b)(2)(A) and 78m(b)(2)(B).

4                                                    V.

5        Issue a judgment, in a form consistent with Rule 65(d) of the Federal Rules

6   of Civil Procedure, permanently enjoining Casavant and his officers, agents,

7   servants, employees and attorneys, and those persons in active concert or

8   participation with any of them, who receive actual notice of the order by personal

9   service or otherwise, and each of them, from aiding and abetting violations of

10  Sections 13(a), 13(b)(2)(A), and 13(b)(2)(B) of the Exchange Act, 15 U.S.C.

11  §§ 78m(a), 78m(b)(2)(A), and 78m(b)(2)(B), and Rules 13a-1, 13a-13, and 13b2-1

12  thereunder, 17 C.F.R. §§ 240.13a-1, 240.13a-13, and from violating Rule 13b2-1

13  thereunder, 17 C.F.R. §§ 240.13b2-1.

14                                                   VI.

15       Enter an order, pursuant to Section 20(e) of the Securities Act, 15 U.S.C.

16  § 77t(e), and/or Section 21(d)(2) of the Exchange Act, 15 U.S.C. § 78u(d)(2),

17  prohibiting Casavant from acting as an officer or director of any issuer that has a

18  class of securities registered pursuant to Section 12 of the Exchange Act, 15 U.S.C.

19  § 78*l*, or that is required to file reports pursuant to Section 15(d) of the Exchange

20  Act, 15 U.S.C. § 78*o*(d).

21                                                  VII.

22       Order Casavant, Edwards, Gutierrez, Kinney, Anthony Tomasso, Kathleen

23  Tomasso, 1st Global, Bagley, NevWest, Anderson, Rumyantsev, Santos, and

24  Dvorak to account for and to disgorge all ill-gotten gains from their illegal

25  conduct, together with prejudgment interest thereon.

26                                                 VIII.

27       Order Casavant, Edwards, Gutierrez, Kinney, Anthony Tomasso, Kathleen

28  Tomasso, 1st Global, Bagley, NevWest, Anderson, Rumyantsev, Santos, and

1  Dvorak to pay civil penalties under Section 20(d) of the Securities Act, 15 U.S.C.

2  § 77t(d), and Section 21(d)(3) of the Exchange Act, 15 U.S.C. § 78u(d)(3).

3                                                    IX.

4          Issue judgments, in a form consistent with Rule 65(d) of the Federal Rules

5  of Civil Procedure, permanently barring Casavant, Edwards, Gutierrez, Kinney,

6  Anthony Tomasso, Kathleen Tomasso, Bagley, Anderson, Rumyantsev, Santos,

7  and Dvorak from participation in any offering of penny stock, including engaging

8  in activities with a broker, dealer, or issuer for purposes of issuing, trading, or

9  inducing or attempting to induce the purchase or sale of any penny stock under

10  Section 20(g) of the Securities Act, 15 U.S.C. § 77t(g), and Section 21(d)(6) of the

11  Exchange Act, 15 U.S.C. § 78u(d)(6).

12                                                   X.

13         Retain jurisdiction of this action in accordance with the principles of equity

14  and the Federal Rules of Civil Procedure in order to implement and carry out the

15  terms of all orders and decrees that may be entered, or to entertain any suitable

16  application or motion for additional relief within the jurisdiction of this Court.

17                                                  XI.

18         Grant such other and further relief as this Court may determine to be

19  just and necessary.

20

21  DATED:  April 7, 2008                      Respectfully submitted,

22

23

24                                              LESLIE A. HAKALA

25                                              Attorney for Plaintiff
                                                Securities and Exchange Commission

26

27

28

                                          27